## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

**MICROSOFT CORPORATION,**

     **Plaintiff,**

     **v.**

**WEIDMANN ELECTRICAL TECHNOLOGY INC.,**

     **Defendant.**

Civil Action No. 5:15-cv-153-gwc

## <u>MICROSOFT'S PRE-HEARING MEMORANDUM</u>

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .............................................................................................ii

I.     BACKGROUND ...................................................................................... 1

II.    THE LICENSE AGREEMENTS BIND WEIDMANN AND ITS AFFILIATES TO THEIR VERIFICATION AND REMEDIES OBLIGATIONS. .................................. 3

III.   SWISS LAW DOES NOT BLOCK THE PERFORMANCE OF A CONTRACTUALLY-REQUIRED VERIFICATION. ....................................................... 5

     A.    Weidmann Has Acknowledged That a Contractually Agreed-Upon Verification Procedure Complies with Article 271. ................................................ 5

     B.    The Parties Agree That a Contractually Agreed-Upon Verification Procedure Complies with Article 273................................................................... 7

IV.   SWISS LAW DOES NOT BLOCK THE USE OF INFORMATION DERIVED FROM A CONTRACTUALLY-REQUIRED VERIFICATION...................................... 8

V.    THE COURT SHOULD ORDER THAT THE CONTRACTUALLY-AGREED VERIFICATION TAKE PLACE. ................................................................................... 13

VI.   CONCLUSION............................................................................................................. 18

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alfadda v. Fenn*,
   149 F.R.D. 28 (S.D.N.Y. 1993) ..................................................................................7

*CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd. P'ship*,
   No. 12-CV-08087, 2013 WL 2661037 (S.D.N.Y. June 12, 2013) .........................................15

*Credit Suisse v. U.S. Dist. Court for Cent. Dist. of California*,
   130 F.3d 1342 (9th Cir. 1997) ...........................................................................5, 15

*In re Spokane Concrete Prods., Inc.*,
   126 Wash. 2d 269 (1995).......................................................................................5

*Linde v. Arab Bank, PLC*,
   706 F.3d 92 (2d Cir. 2013)..................................................................................15

*Madanes v. Madanes*,
   186 F.R.D. 279 (S.D.N.Y. 1999) .............................................................................15

*Milliken & Co. v. Bank of China*,
   758 F. Supp. 2d 238 (S.D.N.Y. 2010)........................................................................15

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
   116 F.R.D. 517 (S.D.N.Y. 1987) .............................................................................15

*Roberts v. Heim*,
   130 F.R.D. 430 (N.D. Cal. 1990)...........................................................................7, 8

*S.E.C. v. Stanford Int'l Bank, Ltd.*,
   776 F. Supp. 2d 323 (N.D. Tex. 2011) ......................................................................15

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*,
   482 U.S. 522 (1987)..........................................................................................15

*Strauss v. Credit Lyonnais, S.A.*,
   249 F.R.D. 429 (E.D.N.Y. 2008) ............................................................................15

*Tiffany (NJ) LLC v. Qi Andrew*,
   276 F.R.D. 143 (S.D.N.Y. 2011) ............................................................................15

*Wultz v. Bank of China Ltd.*,
   298 F.R.D. 91 (S.D.N.Y. 2014) .....................................................................15, 16, 17

**Other Authorities**

Articles 271 and 273 of the Swiss Penal Code .................................................................... *passim*

Swiss Federal Office of Justice Guidelines on International Judicial Assistance in
Civil Matters .............................................................................................................14, 15, 19

Swiss Federal Department of Justice and Police, Request for Authorization
Concerning the Handover of Documents in an English Civil Case, VPB
1/2016.3, Order, dated April 10, 2014 and published January 26, 2016 ........................ *passim*

Weidmann, and not Swiss law, is what stands in the way of compliance with the Microsoft license agreements.  Weidmann has admitted that the verification can take place without implicating Articles 271 and 273 of the Swiss Penal Code, by agreeing to undertake the verification as a "commercial audit" and that "[Ernst & Young] can use their procedures during a commercial audit."  Doc. 54, Defendant's Pre-Hearing Memorandum ("Mem.") at 11.  And so it should; Microsoft has completed over 200 licensing verifications in Switzerland since 2003.

If one cuts through Weidmann's 15-page brief, its expert's 42-page report, and email communications between the parties, it becomes clear that Weidmann's objection to the independent verification is not the verification itself, but the company's potential exposure for any underlicensing.  Weidmann has conditioned its cooperation on Microsoft's waiver of its rights to use the information obtained in Ernst & Young's verification for any purpose other than to informally discuss them with Weidmann in Switzerland.  In other words, before agreeing to the verification, Weidmann would have Microsoft waive any rights to enforce its remedies even if Ernst & Young's verification finds that the value of Weidmann and its affiliates' underlicensing is $1 million but Weidmann refuses to pay more than $1.  There is no law—Swiss or otherwise—that requires this waiver, particularly not in situations where the verification is a contractual obligation.

## I.      BACKGROUND

Effective 2009, Weidmann *and* its affiliates have been using Microsoft products in the United States, Switzerland, and throughout the world.  Doc. 19, First Amended Complaint ("FAC") Ex. 1 § 2 & Ex. 5 § 2.  Through the same license agreements that granted these product use rights, Weidmann *and* its affiliates agreed to allow an independent accountant, selected by Microsoft, to verify their compliance with the licensing terms.  *Id.* Ex. 1 § 8 & Ex. 5 § 8.  As Weidmann's counsel admitted at the December 21, 2015 hearing on its motion to dismiss, "it

will always be [Microsoft's] right to do the verification," Doc. 46, 12/21/15 Hr'g Tr. 11:5-6, and "you know and I know a licensor is entitled to check on the utilization of its software to make sure that there's not impermissible use of the software," *id.* 9:21-23.

Yet, three-and-a-half years after Microsoft exercised this undisputed right by issuing notice of a verification, and nearly a year after Microsoft filed this lawsuit, Weidmann continues to bar entry to Ernst & Young.  There is no way of telling how and to what extent Weidmann's license use landscape has changed over this time.  What is clear, however, is that none of Weidmann's constantly-shifting excuses are borne out by the facts or the law—whether they be complaints about how far Microsoft's selected auditors would have to travel to reach Weidmann's offices (FAC ¶ 37; Doc. 48, Answer ¶ 37) to stated concerns about system stability and data confidentiality (FAC ¶ 40; Answer ¶ 40; Doc. 46, 12/21/15 Hr'g Tr. 62:1-2) to allegations that it has been sued by the wrong Microsoft entity (Doc. 20, Motion to Dismiss at 9-13) to a rejection of Ernst & Young's verification protocol (Doc. 43-2 ("the Microsoft 'proposal' is NOT acceptable")).

Weidmann's latest brief steps off its old hobby horse in favor of a new one—Articles 271 and 273 of the Swiss Penal Code—raised for the first time only two months ago.  *See* Doc. 43-3. Indeed, Weidmann appears to have dropped its earlier arguments about travel, stability, privacy, and confidentiality completely by accepting Ernst & Young's proposed protocol in its entirety. *See* Mem. 11-12.

After demanding that the verification take place in Switzerland, *see* Doc. 46, 12/21/15 Hr'g Tr. 65:11 (Mr. Frazza: "We want Switzerland."); Doc. 52, 4/6/16 Hr'g Tr. 5:10-11 (Mr. Frazza: "We have asked that the audit be done in Switzerland."), Weidmann now argues that Articles 271 and 273 prevent just that.  Weidmann's newest argument is likewise without

merit and is yet another attempt, in a long line of attempts, to avoid its contractual obligations. Indeed, Weidmann agrees that the verification as proposed by Ernst & Young can take place in Switzerland as a "commercial audit."  Mem. 11.  But Weidmann places two conditions on how the *results* of the verification can be used—that the information cannot leave Switzerland (except that the results can apparently be whispered into Microsoft's ear) and cannot be used in this Court should Weidmann fail to pay in accordance with the verification results.  These two conditions on how the verification information can be used are completely untethered from the requirements of Article 271, which place no restrictions on how data, once collected in accordance with a contractual obligation, can be used.  The two conditions are also entirely unnecessary to comply with the foreign espionage protections of Article 273 given that any personal identifier information can be redacted.

Thus it is Weidmann, not Articles 271 and 273, that bars compliance with the contractually-agreed verification.

## II.      THE LICENSE AGREEMENTS BIND WEIDMANN AND ITS AFFILIATES TO THEIR VERIFICATION AND REMEDIES OBLIGATIONS.

Weidmann and its affiliates are bound by the license agreements.  The license agreements were entered into "between the Customer and the Microsoft Affiliate signing," and "Customer . . . agree[d] to be bound by the terms" of the license agreements.  FAC Exs. 4 & 8. "Customer" is a defined term that includes "the entity that has entered into this agreement and its Affiliates."  FAC Ex. 1 § 1 & Ex. 5 § 1.  And "Affiliates," in turn, include Weidmann's Swiss parent, a "legal entity . . . which owns Customer."  FAC Ex. 1 § 1; *see also id.* Ex. 5 § 1 (defining "Affiliate" to include a "legal entity . . . that owns a party").  Thus, when Mark Vaal (Weidmann's IT Director) signed the license agreements on behalf of "Customer," he bound Weidmann *and* its affiliates, which include Weidmann's Swiss parent.

3

Both Weidmann and its Swiss parent therefore have a contractual obligation to undertake the verification procedure required of "Customer" as set forth in the license agreements. *See* FAC Ex. 1 § 8 & Ex. 5 § 8. And both Weidmann and its Swiss parent have a contractual obligation to comply with the remedies for non-compliance required of "Customer": "If verification or self-audit reveals any unlicensed use, Customer must promptly order sufficient licenses to cover its use. If material unlicensed use is found, Customer must reimburse Microsoft for the costs Microsoft has incurred in verification and acquire the necessary additional licenses at single retail license cost with 30 days." *Id.*

Yet Weidmann and its expert, Mark Livschitz, argue that an order from this Court enforcing the license agreements cannot be carried out under Swiss law because Weidmann's Swiss parent is not encompassed by the scope of the license agreements. Mem. 8, 13-14; Mem. Ex. A ("Livschitz") at 14. That claim is an underlying assumption of Mr. Livschitz's report, and it is plainly wrong. Not only are both Weidmann "and its Affiliates" bound by the black and white terms of the license agreements, but Weidmann's argument conflicts with the sworn affidavit of Mark Vaal. Doc. 54-2, Ex. B.

In his affidavit, Mr. Vaal explains that "[b]eginning in or about June 2010, WICOR [Weidmann's Swiss parent] implemented a program to centralize responsibility for purchasing licenses for Microsoft Corporation and most other software." *Id.* ¶ 7. "Since July 2010, the Corporate IT group alone has taken responsibility to purchase and manage all Microsoft Corporation licenses." *Id.* ¶ 9. Given Mr. Vaal's representation, when Mr. Vaal signed the 2010 license agreement with Microsoft on September 29, 2010, FAC Ex. 8, he furthered the WICOR Corporate IT group's centralized purchasing and management of "all Microsoft Corporation licenses." It is disingenuous of Weidmann to argue that its affiliates are not bound by the license

agreements when its affiliates have been using Microsoft products throughout their organization. FAC Ex. 1 § 2 & Ex. 5 § 2.

Further, Weidmann cannot claim that Mr. Vaal was without authority to bind Weidmann's affiliates, given Mr. Vaal's admission that Weidmann and its affiliates centralized purchasing of all Microsoft products and thereby benefited from the license agreements executed by him. *See In re Spokane Concrete Prods., Inc.*, 126 Wash. 2d 269, 278 (1995) ("By retaining and using the benefit obtained, the corporation ratifies the contract.").

## III. SWISS LAW DOES NOT BLOCK THE PERFORMANCE OF A CONTRACTUALLY-REQUIRED VERIFICATION.

### A. Weidmann Has Acknowledged That a Contractually Agreed-Upon Verification Procedure Complies with Article 271.

Article 271 of the Swiss Penal Code prohibits activities carried out by persons "on behalf of a foreign state on Swiss territory . . . where such activities are the responsibility of a public authority or public official."[1]  Thus, as a private contractual obligation, Weidmann and its affiliates are free to comply with the verification without implicating Article 271.  Weidmann has admitted as much by agreeing to undertake the verification as a "commercial audit" and to adopt Ernst & Young's protocol in its entirety.  Mem. 11.  And so it should.  Weidmann's own expert, Mr. Livschitz, has recognized that "Swiss law knows the concept of contractual gathering of information which is not considered gathering of evidence for court proceedings but rather, the exercise of a contractual right."  Livschitz 13; *see id.* (explaining that a "contractual

---

[1] Translation provided by the Federal Council of the Swiss Confederation at https://www.admin.ch/opc/en/classified-compilation/19370083/index.html and cited on page 4 of Mr. Livschitz's report.  The Federal Council is "the highest governing body in the Swiss Executive Branch."  *Credit Suisse v. U.S. Dist. Court for Cent. Dist. of California*, 130 F.3d 1342, 1346 (9th Cir. 1997).

rendering of accounts (or the conduct of a contractually agreed upon audit) . . . *would not fall under art. 271*." (emphasis added)).

The parties are in accord that performance of a contractual obligation falls outside the scope of Article 271. As Microsoft's expert on Articles 271 and 273, Philipp Fischer, will explain at the May 10 hearing, Article 271 was enacted in the period between the two World Wars, when Switzerland faced serious political tensions, to reinforce Swiss sovereignty against threats from abroad.[2] The focus and purpose of Article 271 is to protect Swiss sovereignty from the influence of foreign states, not to prevent private parties from entering into and carrying out contractual obligations.

Mr. Fischer's explanation is confirmed by the Swiss Federal Department of Justice and Police,[3] which states that "actions that are allowed to be carried out by private individuals as part of an intrastate lawsuit cannot fall under the element of offense if the actions are carried out with regard to a foreign court case." Ex. B (VPB 1/2016.3 dated April 10, 2014 and published January 26, 2016) (translated) at 36. In other words, if a Swiss company can do something in Switzerland, that conduct is not suddenly prohibited if a foreign court becomes involved.

Because Weidmann's verification obligations under its license agreements with Microsoft are contractual obligations, compliance with them does not implicate Article 271.

---

[2] Mr. Fischer, whose curriculum vitae is attached as Ex. A, is uniquely situated to explain the non-applicability of Articles 271 and 273. He is trained in both Swiss and United States law, having received his law degree in Switzerland from the University of Geneva and an LL.M. from Harvard Law School. He has advised numerous clients on Articles 271 and 273 and is an author of the book "U.S. Pretrial Discovery on Swiss Soil," which contains a chapter devoted to Swiss blocking statutes, including both Articles 271 and 273. Mr. Fischer's book has been cited as an authority in recent opinions of the Swiss Federal Department of Justice and Police applying Article 271. Ex. B (VPB 1/2016.3 dated April 10, 2014 and published January 26, 2016) (translated) at 35.

[3] The Swiss Federal Department of Justice and Police is one of the departments of the Swiss Federal government. Its role is comparable to that of the U.S. Department of Justice.

Even Weidmann agrees that the audit can move forward in Switzerland as a contractual

obligation.  Mem. 11-12.  It simply does not want to.

      **B.**     **The Parties Agree That a Contractually Agreed-Upon Verification**
                  **Procedure Complies with Article 273.**

Weidmann's reliance on Article 273 to bar the verification is also misplaced.  Article 273

prohibits persons from obtaining "a manufacturing or trade secret in order to make it available to

an external official agency, a foreign organisation, a private enterprise, or the agents of any of

these."[4]  Like Article 271, Article 273 was enacted in the interwar period and its purpose is

public in nature—it is "intended to protect Swiss sovereignty and the Swiss economy."  *Alfadda*

*v. Fenn*, 149 F.R.D. 28, 32 (S.D.N.Y. 1993).

As Mr. Fischer will explain at the May 10 hearing, Article 273 applies two different

standards to two different types of information—state secrets of national importance and

business secrets of a private nature.  State secrets of national importance may only be made

available outside of Switzerland with the permission of the Swiss authorities.  Private business

secrets, on the other hand, may be made available outside of Switzerland with only the consent

of the "master," or owner, of the business secret.  *See Roberts v. Heim*, 130 F.R.D. 430, 436

(N.D. Cal. 1990) ("Article 273 does not prohibit a person from divulging his own business

affairs.").

Mr. Fischer will explain that the information Ernst & Young seeks in its verification—the

numbers and types of Microsoft products being used by Weidmann and its affiliates as well as

the numbers and types of Microsoft products they are entitled to use—are not considered secrets

---

[4] Translation provided by the Federal Council of the Swiss Confederation at
https://www.admin.ch/opc/en/classified-compilation/19370083/index.html and cited on page 4 of
Mr. Livschitz's report.

of national importance.[5]  Thus, there is no doubt that Weidmann should be "without fear of an

Article 273 sanction."  *Roberts*, 130 F.R.D. at 436.

Significantly, Mr. Livschitz never says that the information to be generated by Ernst &

Young qualifies as business secrets.  Rather, he couches the invocation of Article 273 as a

speculative concern: "it is ***conceivable*** that the audit in dispute ***may*** touch upon manufacturing or

trade secrets protected by art. 273."  Livschitz 11 (emphasis added).  The only business secret

information that Mr. Livschitz says the audit "***may*** in ***theory*** yield," are "findings relating to

Swiss-based third party vendors of IT hard- and software and the contractual relationship

between such third party vendors and Weidmann Switzerland."  *Id.* (emphasis added).  Assuming

that the information even qualifies as a business secret, this theoretical concern can be easily

addressed by redacting the names of any third-party vendors as, for example, provided for in

Appendix D of Ernst & Young's protocol.  Doc. 43-1.  As Mr. Fischer is prepared to explain, the

redaction of third-party names alleviates any concern that their contractual relationship with

Weidmann will be revealed in contravention of Article 273.  In addition, a non-disclosure

agreement such as the one proposed in Appendix E of Ernst & Young's protocol, adds a further

layer of protection that prevents the disclosure of any business secrets.

## IV.   SWISS LAW DOES NOT BLOCK THE USE OF INFORMATION DERIVED FROM A CONTRACTUALLY-REQUIRED VERIFICATION.

On April 21, 2016, after filing its memorandum, Weidmann emailed Microsoft its five-

point proposal submitted to the Court.  Mem. 11-12.[6]  After a subsequent telephone conference

clarifying the proposal, Microsoft memorialized what it believed to be the parties' agreement:

---

[5] Ernst & Young's ultimate work product will be a spreadsheet that reconciles the "Customer license entitlement" with "deployment information for each version of each Microsoft product family identified, in use, or deemed to be required."  *See* Doc. 43-1, Appendix C of Ernst & Young's protocol.

1.  Weidmann agrees to immediately commence and complete the contractually-agreed upon verification of Weidmann and its affiliates' use of Microsoft products.  To avoid any doubt, Weidmann is undertaking the verification pursuant to the terms of the license agreements and as a contractual obligation of Weidmann and its affiliates, and not pursuant to a Court order.

2.  Weidmann agrees that Ernst & Young Ireland ("EY") will conduct the independent verification of Weidmann and its affiliates according to the terms and methodology of EY's verification protocol sent to Weidmann on January 22, 2016.  Weidmann further agrees that EY may use EY tools if absolutely necessary, with the understanding that the EY script functions by querying systems for installed software through Windows Management Instrumentation. Based on this agreement and Weidmann's acceptance of the EY verification protocol, the parties discussed that EY's attendance at the May 10 hearing is unnecessary and agreed that EY need not attend it.

3.  If EY completes the verification and the verification reveals any unlicensed use by Weidmann and/or its affiliates, Weidmann and Microsoft will meet in Switzerland within one week of the completion of EY's verification to resolve any remedies owed to Microsoft, including the remedies specified in the license agreements.  Notwithstanding paragraph 4, while the parties are mutually engaged in good-faith discussions to resolve any remedies owed to Microsoft, and unless otherwise ordered by the court, the information obtained in EY's verification will be disclosed only to EY, Weidmann and its affiliates, Microsoft and its affiliates, and Microsoft's outside counsel and their agents.

4.  Microsoft reserves all rights to use the information obtained in EY's verification to enforce its claims and to resolve any disagreements about the remedies owed to Microsoft, including the remedies specified in the license agreements.  Weidmann reserves the right to object to such use of the information obtained in EY's verification.

Ex. D at 7-8.

Weidmann refused to proceed with the verification.  Instead, it demanded that Microsoft adopt every word of Weidmann's April 21 proposal without clarification, modification, or reservation of rights, including the impossibly overbroad term that "the suggestions of

---

[6] Weidmann's memorandum describes the proposal as "verbatim" a proposal "Weidmann *has presented* Microsoft's counsel."  Mem. 11-12 (emphasis added).  To be clear, Microsoft received the proposal for the first time *after* Weidmann filed its memorandum.  Ex. C at 1 ("Now that you have Weidmann's legal Memorandum and the Report of Mark Livschitz, please accept this e-mail as a good faith proposal.").

Mr. Livschitz be complied with to avoid anyone violating Swiss law." *See id.* at 5 (asking why Microsoft "feel[s] the need to re-write the very basic and straight-forward items . . . .  If you simply confirm that the items below are acceptable . . . then we can have the audit commence immediately"); *id.* at 4 ("The items set forth in my April 21 e-mail are designed to comply with the applicable Swiss criminal laws and if you would simply agree to same the audit will commence."); *id.* at 1 ("I have REPEATEDLY stated, and state AGAIN, that the audit can proceed pursuant to the points set forth in the April 21 e-mail.  Regrettably, Microsoft has refused to the points in the April 21 e-mail.").

As it turns out, Weidmann's objection is not to the verification itself but to Microsoft's use of the information derived from the verification: "Microsoft's refusal to have the results of the audit remain in Switzerland . . . makes it impossible for the audit to proceed.  I know in my heart I did everything I could to allow the audit to proceed but unfortunately it just didn't happen."  *Id.* at 2.  The logjam boils down to two conditions imposed by Weidmann, neither of which is grounded in compliance with Swiss law.

*First*, Weidmann insists that "the results of the audit will have to stay in Switzerland." Mem. 12.  Neither Articles 271 and 273, nor Swiss privacy and data protection laws, mandate such a condition.  As explained above, Article 271 does not apply to the performance of contractual obligations and Mr. Fischer will explain that nothing in Article 271 requires information collected pursuant to a private contractual agreement to stay in Switzerland.  And, none of the redacted information that would leave Switzerland under the Ernst & Young protocol is subject to the strictures of Article 273.  *See* § III.B, *supra*.  Mr. Livschitz does not argue otherwise.  There also are no Swiss privacy or data protection laws that prohibit the results of

10

Ernst & Young's verification from leaving Switzerland. [7]  Thus, there is no legal basis for

Weidmann's condition that the audit results stay in Switzerland.

    *Second*, Weidmann conditions the verification on Microsoft's waiver of its rights to use

information derived from Ernst & Young to enforce its remedies, if necessary.  Livschitz 2

(imposing "precautions in order to prevent the audit findings from being used as evidence in the

US court proceedings (i.e. ensure out of court use only)"); *id.* 17 ("precautions would need to be

taken in order to ensure that the audit findings do not make their way into the court

proceedings").  When Microsoft's counsel asked whether "Weidmann would have Microsoft

waive any rights to enforce its remedies even if EY's verification finds that the value of

Weidmann and its affiliates' underlicensing is $1 million but Weidmann refuses to pay more

than $1 dollar," and the basis for such a position, Weidmann did not respond substantively.

Ex. D at 3.

    Weidmann's position has no legal support.  Again, Article 271 is inapplicable.  As

explained above, and as Mr. Livschitz agrees, a verification carried out pursuant to a contractual

obligation does not implicate Article 271.  Livschitz 13.  To the extent that Weidmann implies

that the performance of a contractual provision runs afoul of Article 271 because the contract

could later be subject to legal action outside of Switzerland, that implication is facially absurd.

Swiss business would grind to a halt if companies were prohibited from performing their

---

[7] Based on Weidmann's previous invocation of privacy and data protection laws, Microsoft will offer the expertise of Jürg Schneider on Switzerland's privacy and data protection laws.  *See* Exs. E and F.  Mr. Schneider is a partner at the Walder Wyss firm in Switzerland.  His practice regularly involves counseling clients on Swiss privacy and data protection laws with a particular focus on trans-border and international contexts.  He regularly publishes and lectures on Swiss privacy and data protection issues.  He is a member of the board of directors of the International Technology Law Association and co-chair of its data protection committee.  He received his law degree from the University of Neuchatel in Switzerland.  Mr. Schneider's curriculum vitae is attached as Ex. G.

contractual obligations simply because they entered into contracts enforceable outside of Switzerland or subject to court proceedings abroad.  As Mr. Fischer will explain at the May 10 hearing, Article 271 does not prevent the performance of an otherwise private action, such as compliance with a private contractual obligation, even if there is a possibility that performance will later be subject to foreign litigation.

The Swiss Federal Department of Justice and Police has endorsed this position, stating that a Swiss company can procure documents from its Swiss affiliates even if those documents will be used in a foreign litigation, *and even where there was no contractual obligation*.  Ex. B (VPB 1/2016.3 dated April 10, 2014 and published January 26, 2016) (translated) at 32. Certainly, where, as here, the verification is a contractual obligation, there should be no question that Article 271 is not a gating statute.  Nor is the information that would leave Switzerland under the Ernst & Young protocol subject to Article 273 due to the redaction safeguards.  Thus, Articles 271 and 273 provide no basis for blocking the use of information obtained in Ernst & Young's verification in this Court.

Weidmann's conditions appear to be calculated to render the verification useless and illusory rather than to ensure compliance with Swiss law.  Weidmann knows that if the verification results cannot leave Switzerland and cannot be shared with this Court, Microsoft will have to rely on Weidmann's good faith to pay for any underlicensing uncovered during the verification.  Based on Weidmann's conduct both before and during this litigation, Microsoft has good reason to doubt that any such payment will be forthcoming.

Weidmann's continued insistence on two onerous conditions untethered to any legitimate legal basis demonstrates what Microsoft has suspected from the beginning—that Weidmann simply prefers not to abide by its contractual obligations.  If Weidmann had really "bent over

backwards," Mem. 11, or even stood up straight, the verification would have been completed by now.  Weidmann's continued obstructionism stands out in contrast to other Swiss entities.  Since 2003, Microsoft has completed over 200 independent and self-verifications in Switzerland.

## V.   THE COURT SHOULD ORDER THAT THE CONTRACTUALLY-AGREED VERIFICATION TAKE PLACE.

If Weidmann continues to bar the contractual verification, Microsoft will request that the Court order Weidmann to comply with its contractual obligations.

Weidmann objects to this relief by claiming that compliance with a Court order in Switzerland would violate Articles 271 and 273.  Livschitz 13.  Weidmann is wrong.  *First*, as Mr. Fischer will explain at the May 10 hearing, Article 271 does not prohibit the parties' compliance with a contractual obligation in Switzerland, even if doing so is required by a foreign court's order.  For example, the Swiss Federal Department of Justice and Police recently confirmed that a Swiss company can, on the basis of a court order, not only provide its own documents for use in a pending foreign proceeding, but also obtain documents from its other group companies in Switzerland.  Ex. B (VPB 1/2016.3 dated April 10, 2014 and published January 26, 2016) (translated) at 36.

Mr. Livschitz's position, that an order requiring compliance with a contractual obligation violates Article 271, also throws common sense out the door.  Carried to its logical end, his opinion would mean that no international contract with a Swiss entity is worth the paper it is written on because any order requiring compliance with its terms would be barred by Swiss law.  Mr. Livschitz also nonsensically implies that while a Swiss entity could perform a contractual obligation before a court order is issued, it is barred from doing so once it is subject to a court order.  Not surprisingly, Mr. Livschitz cites no case law for his proposition—and Mr. Fischer is unaware of any—and the three German and French-language cases attached to Mr. Livschitz's

report do not support this position.[8]  In fact, contrary to Mr. Livschitz's representation that the cases are "three published judgments under art. 271 SPC," Livschitz 17, the translations reveal that Article 271 is *nowhere mentioned* in two of the cases, Exs. I & J.

*Second*, as Mr. Fischer will explain at the May 10 hearing, the Swiss Federal Office of Justice's Guidelines on International Judicial Assistance in Civil Matters ("Guidelines"),[9] a document relied upon by Mr. Livschitz, permits compliance with the order of a foreign court unless failure to comply with the order leads to automatic sanctions of a non-procedural nature. The Guidelines distinguish between consequences of a "procedural nature (e.g. a factual claim of the other party is accepted as true or the loss of the right to prove the claim at a later stage)" and consequences of a non-procedural nature "(e.g. the criminal offence of contempt of court)." Ex. K, Guidelines 20-21.  The Guidelines also distinguish between coercive measures that attach automatically and measures that "will not automatically result in the event of a refusal." Ex. K, Guidelines 21.  Microsoft is seeking a permitted procedural order without automatic sanctions.

The Guidelines were applied in a recently-published opinion of the Swiss Federal Department of Justice and Police, which again confirmed that Article 271 does not apply "if the refusal of collaboration does not lead to penal sanctions." Ex. B (VPB 1/2016.3 dated April 10, 2014 and published January 26, 2016) (translated) at 36 (citing to Guidelines).  In that case, the Swiss Federal Department of Justice and Police explained that compliance with an English High

---

[8] Mr. Livschitz did not provide a translation of the cases he attached, so Microsoft has obtained English translations attached as Exhibits H, I & J.  None involved a situation where a Swiss entity was accused of violating Article 271 for performing a contractual obligation.

[9] The Swiss Federal Office of Justice is a constituent agency of the Swiss Federal Department of Justice and Police.  The Swiss Federal Office of Justice is responsible for legislative matters pertaining to constitutional and administrative law, private law, and criminal law.  It functions in an advisory capacity to the Swiss government in legislative matters and issues advisory opinions. In international matters, it functions as the central authority for mutual legal assistance.

Court of Justice order requiring the "handover of certain documents and provision of information" by a Swiss litigant was permitted because disregard of the order "does not lead to any direct sanction.  Rather, the party requesting handover would have to request a special order from the court."  *Id.*

  ***Third****,* neither Weidmann nor Mr. Livschitz provides any authority for using Article 271 to bar the enforcement of a contractual obligation.  Instead, every one of the cases cited in Weidmann's brief relates to a comity analysis applied to circumstances in which discovery orders may run afoul of Swiss blocking statues.[10]  Weidmann's comity argument, to which it devotes almost the entirety of its brief, does not apply here for one simple reason—there is no conflict between Swiss laws on the one hand and Weidmann and its affiliates' performance of its contractually-required verification obligations on the other hand.  Mem. 4-14.  "The threshold question in any comity analysis is to determine whether there is a 'true conflict' between domestic and foreign law—that is, whether 'compliance with the regulatory laws of both countries would be impossible.'"  *Wultz v. Bank of China Ltd.*, 298 F.R.D. 91, 100 (S.D.N.Y. 2014) (internal citations omitted).  As discussed above, the answer to that question is "no."

_____

[10] *See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa,* 482 U.S. 522, 525 (1987) (discovery); *Credit Suisse v. U.S. Dist. Court for Cent. Dist. of California*, 130 F.3d 1342, 1346 (9th Cir. 1997) (discovery); *Wultz v. Bank of China Ltd.*, 298 F.R.D. 91, 96 (S.D.N.Y. 2014) (discovery); *CE Int'l Res. Holdings, LLC v. S.A. Minerals Ltd. P'ship*, No. 12-CV-08087, 2013 WL 2661037, at *4 (S.D.N.Y. June 12, 2013) (post-judgment discovery); *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 144 (S.D.N.Y. 2011) (discovery); *S.E.C. v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 327 (N.D. Tex. 2011) (discovery); *Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 243 (S.D.N.Y. 2010) (discovery); *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 431 (E.D.N.Y. 2008) (discovery); *Madanes v. Madanes*, 186 F.R.D. 279, 285 (S.D.N.Y. 1999) (recognizing foreign privilege under principles of comity); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 519 (S.D.N.Y. 1987) (discovery).

Even if this Court were to consider the comity factors, the factors weigh in favor of Microsoft.  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987); *Linde v. Arab Bank, PLC*, 706 F.3d 92, 110 (2d Cir. 2013).

1. Importance of the information.  Weidmann admits that this factor weighs in favor of Microsoft: "Weidmann does not dispute the relevance of an audit or its potential importance in this case."  Mem. 10.

2. Specificity of the request.  Weidmann has agreed to use Ernst & Young's verification protocol.  Mem. 11.  Weidmann has not complained that any part of the protocol lacks specificity.  Mem. 13.  This factor weighs in Microsoft's favor.

3. Whether the information originated in the U.S.  The verification seeks information on Weidmann's and its affiliates' usage of Microsoft products worldwide, and some of the information originates outside of the U.S.  But this factor alone is not dispositive and courts have refused to defer to foreign blocking statutes where the information sought originated outside of the U.S.  *See, e.g., Wultz*, 298 F.R.D. at 101-02.

4. Availability of alternative means.  Weidmann argues that its "cooperative" proposal is a viable alternative to a court-ordered verification.  The conditions Weidmann insists on, however, would render the verification useless by restricting Microsoft's ability to use the verification results to enforce its rights.  Further, it is Mr. Livschitz's opinion that alternative avenues through the Swiss government or the Hague Convention are unpredictable at best or foreclosed.  *E.g*., Livschitz 8 ("Microsoft is at risk of being declined the audit in dispute within the framework of a Hague Convention MLAT request"); *id*. at 9 ("Microsoft is at risk that a request to conduct the audit under the Hague Convention on Taking of Evidence in Switzerland is also rejected"); *id.* ("If Microsoft opts . . . to involve Swiss authorities . . . the Swiss

16

government or at its behest, the Swiss Federal Office of Justice, would have to take a decision which fundamentally is political in nature and thus, hard to predict"). This factor weighs in Microsoft's favor.

5. <u>Balance of sovereign interests.</u>  Switzerland has no interest in preventing the parties from carrying out their private contractual obligations, and the verification complies with Swiss laws. On the other hand, "the United States has a substantial interest in fully and fairly adjudicating matters before its courts." *Wultz*, 298 F.R.D. at 103 (internal citations omitted). This factor weighs in favor of Microsoft.

6. <u>Hardship of party facing conflicting legal obligations.</u>  Weidmann will suffer no hardship from "conflicting legal obligations" because the proposed verification is fully compliant with Swiss law. *See* § III, *supra*. Mr. Livschitz reports that 65 individuals have been convicted under the blocking statutes between 1984 and 2014, but he does not claim that even one of these convictions resulted from the performance of a contractual obligation. Livschitz 15. This factor weighs in favor of Microsoft.

7. <u>Good faith.</u>  Weidmann's good faith claims do not accord with the factual record. Microsoft issued its notice of verification on January 3, 2013. Throughout 2013, Weidmann promised to initiate the independent verification without ever doing so. FAC ¶¶ 25-27. Beginning in 2014, Weidmann deployed a broad range of excuses only to ultimately acknowledge that they were not barriers to a verification. As a few examples:

- In 2014, Weidmann claimed that Ernst & Young P/S could not perform the verification because it had performed financial auditing work for Weidmann. FAC ¶ 30. When Ernst & Young assigned a team from Ireland, Weidmann complained about that as well. *Id.* ¶ 37. Two years later, Weidmann has come full circle and agreed that Ernst & Young Ireland can perform the verification. Mem. 11.

- Throughout 2014 and 2015, Weidmann claimed that Ernst & Young's inventory tools threatened the stability of its IT systems and blocked the verification on that basis.

17

FAC ¶¶ 35-36.  Yet, on April 21, 2016, Weidmann agreed that these same inventory tools are acceptable.  Mem. 12 ("Weidmann Switzerland will allow the EY tool to be used").

- On January 22, 2016, Microsoft sent Ernst & Young's protocol to Weidmann. Weidmann responded that "the Microsoft 'proposal' is NOT acceptable."  Doc. 43 Ex. 3. Yet, many months later, in its Memorandum to the Court, Weidmann states that "EY can use their procedures during a commercial audit."  Mem. 11.

- In 2015 and until very recently, Weidmann demanded that the verification take place in Switzerland, *see* Doc. 46, 12/21/15 Hr'g Tr. 65:11 (Mr. Frazza: "We want Switzerland."); Doc. 52, 4/6/16 Hr'g Tr. 5:10-11 (Mr. Frazza: "We have asked that the audit be done in Switzerland.").  Weidmann then argued that Articles 271 and 273 prevented just that. But in its April 21, 2016 Memorandum, Weidmann acknowledges that the verification can "be conducted in Switzerland prior to the May 10, 2016 hearing . . . ."  Mem. 11.

- In 2016, Weidmann began claiming that Articles 271 and 273 bar it from undertaking the verification.  Yet, it now agrees that "a commercial audit" is permissible. *Id.*

- For months, Weidmann refused to confer with Microsoft as required by Federal Rule of Civil Procedure 26(f).  Last month, Weidmann responded to Microsoft's discovery requests with an unequivocal statement of refusal: "Weidmann is NOT going to engage in any discovery" and "You can file whatever motion you want after you feel the time to respond to the discovery request in question."  Ex. L at 1.  Weidmann has not explained why it believes that Weidmann's US entities are entitled to obstruct discovery.

This good-faith factor weighs in favor of Microsoft.

## VI.   CONCLUSION

If Weidmann has not undertaken the verification by the May 10 hearing set by the Court, Microsoft respectfully requests that the Court enter an order requiring Weidmann to comply with its contractual verification obligations in accordance with Ernst & Young's verification protocol. Should Weidmann fail to comply with a Court order requiring verification, by standing on its unfounded Swiss law objections, Microsoft will seek an adverse inference sanction against Weidmann allowing Microsoft to estimate the damages owed under the license agreements without the verification of Weidmann and its affiliates' usage of Microsoft products.  This sanction does not implicate Swiss law because it is a *non-automatic* and *procedural* sanction for non-compliance of a contractual duty, akin to those discussed in the Guidelines.

Respectfully submitted,

Dated:  May 5, 2016

*/s/ Geoffrey J. Vitt*
Geoffrey J. Vitt
gvitt@vittandassociates.com
VITT & ASSOCIATES PLC
8 Beaver Meadow Road
P.O. Box 1229
Norwich, VT 05055
Tel: 802.649.5700
Fax: 802.649.1692

Clara J. Shin (admitted *pro hac vice*)
cshin@cov.com
Wallace J. Lee (admitted *pro hac vice*)
wlee@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Tel: 415.591.6000
Fax: 415.591.6091

*Attorneys for Plaintiff Microsoft Corporation*

## CERTIFICATE OF SERVICE

I certify that on May 5, 2016, I filed the foregoing document with the Court via the

CM/ECF system, which will automatically deliver electronic copies to all counsel of record.

By:     */s/ Geoffrey J. Vitt*