UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 DEC -7 PM 12: 02

CLERK
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| MICROSOFT CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:15-cv-153 |
| | ) | |
| WEIDMANN ELECTRICAL | ) | |
| TECHNOLOGY INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**
(Docs. 82, 83, 95)

Plaintiff Microsoft Corporation (Microsoft) brings this action against Weidmann

Electrical Technology Inc. (Weidmann), alleging in Count II that Weidmann is in breach of

contract for failure to comply with a provision of the parties' software license agreements that

allows Microsoft to verify the number of software products used by Weidmann. (*See* Doc. 19

at 16.)[1]  For relief, Microsoft seeks, among other things, an order requiring specific performance

of Weidmann's verification obligation. (*Id.* at 19.)  Thus far, the case has seen litigation

regarding Microsoft's standing to sue (*see* Doc. 45 (denying Weidmann's motion to dismiss)), a

failed attempt to negotiate a mutually acceptable process for verification, and considerable

discussion about whether an order requiring the verification process to proceed at the

headquarters of Weidmann's parent company's in Switzerland would violate Article 271 of the

Swiss Criminal Code.

---

[1] Among its other claims in Count II, Microsoft alleges that Weidmann is in breach for
failing to order licenses for all copies of Microsoft software products it has run during the term
of the License Agreements. (*Id.* at 17.)

On that latter issue, the court heard testimony on May 10, 2016 from the parties'

respective Swiss law experts regarding Article 271.  (*See* Doc. 62, Hr'g Tr.)  The court

subsequently invited summary judgment motions (*see* Doc. 78), and in response the parties have

filed motions for partial summary judgment (Docs. 82, 83).

## Background

The following facts are undisputed except where noted.  Weidmann Electrical

Technology, Inc. (Weidmann) is a Vermont corporation with its principal place of business in

St. Johnsbury, Vermont.  Although there is some dispute or uncertainty about the precise

relationships between all of the Weidmann affiliates (*see* Doc. 89-2),[2] the court takes it as

undisputed for present purposes that Weidmann's corporate parent is WICOR Holding AG

("WICOR"), which is headquartered in Rapperswil, Switzerland.  (*See* Doc. 83-8 ¶¶ 2–3.)

WICOR and its subsidiaries operate a multi-national business engaged in the manufacture of

medical equipment and other products.

## I.   The License Agreements

Effective May 8, 2009, Weidmann entered into a volume licensing agreement allowing it

to make use of Microsoft programs.  The agreement allows Weidmann and its affiliates to use

multiple copies of Microsoft products and report the volume of use on a continuing basis.  This

arrangement is governed by the following agreements: (a) Microsoft Business and Services

Agreement; (b) Select Agreement; (c) Select Enrollment Form; and (d) Select Signature Form

(collectively, the "2009 License Agreement").  Effective September 30, 2010, Weidmann

entered into an additional volume licensing agreement.  The 2010 arrangement is governed by

_____

[2] Document 89-2 is the October 12, 2016 affidavit of Microsoft counsel Attorney Wallace
J. Lee.  Attorney Lee states that Weidmann has not produced discovery in response to
Microsoft's request for documents that would identify all Weidmann affiliates and their
relationship.

the following agreements: (a) Microsoft Business and Services Agreement; (b) Select

Agreement; (c) Select Enrollment Form; and (d) Select Signature Form (collectively, the "2010

License Agreement"; and, together with the 2009 License Agreement, the "License

Agreements").  The License Agreements select Washington law as the applicable law.

(*See* Doc. 19-1 at 12; Doc. 19-5 at 12.)

      The License Agreements define "Customer" as "the entity that has entered into this

agreement and its Affiliates."  (Doc. 19-1 at 3; Doc. 19-5 at 2.)  The License Agreements define

"Affiliate" in pertinent part as "any legal entity that a party owns, that owns a party, or that is

under its common ownership."  (Doc. 19-5 at 2.)[3]  The License Agreements define "Microsoft"

as "the Microsoft Affiliate that has entered into this agreement and its Affiliates, as appropriate."

(Doc. 19-1 at 3; Doc. 19-5 at 3.)

      The License Agreements contain a section entitled "Verifying compliance" which states

in pertinent part as follows:

      **a.**      **Right to verify compliance.**  Customer must keep records relating to the
Products it and its Affiliates use or redistribute under this agreement.  Microsoft
has the right to verify compliance with the License Agreement, at Microsoft's
expense, during the term of the applicable enrollment . . ., and for a period of one
year thereafter.

      **b.**      **Verification process and limitations.**  To verify compliance, Microsoft
will engage an independent accountant from an internationally recognized public
accounting firm, which will be subject to a confidentiality obligation.
Verification will take place upon not fewer than 30 days notice, during normal
business hours and in a manner that does not interfere unreasonably with
Customer's operations.  Customer must promptly provide the accountant with any
information it reasonably requests in furtherance of the verification.  As an

---

[3] This definition of "Affiliate" appears in the 2010 License Agreement.  The 2009
License Agreement contains a substantially similar definition: "(1) with regard to Customer, any
legal entity that Customer owns, which owns Customer, or which is under common ownership
with Customer, and (2) with regard to Microsoft, any legal entity that Microsoft owns, which
owns Microsoft, or which is under common ownership with Microsoft."  (Doc. 19-1 at 2.)

alternative, Microsoft can require Customer to complete Microsoft's self-audit questionnaire relating to the Products Customer and any of its Affiliates use or redistribute under this agreement, but reserves the right to use a verification process as set out above.

(Doc. 19-5 at 9.)[4]

## II.   January 2013 Notice of Verification

On January 3, 2013, Microsoft Ireland Operations Limited provided notice to Weidmann that it intended to carry out an independent verification of Weidmann's compliance with the terms of the License Agreements, and that it had selected Ernst & Young P/S ("EY") to conduct the verification.  (*See* Doc. 62 at 41; *see also* Doc. 88-3.)  It is undisputed that, since that time, the verification process has not occurred.  Claiming that Weidmann had conducted a "campaign of obstruction" to avoid the verification process, Microsoft filed its original complaint in this case on June 30, 2015.  (Doc. 1 at 10.)  Weidmann maintains that it was not obligated to agree to the scope and methodology proposed by Microsoft, and that Weidmann did not wrongfully obstruct the verification authorized by the License Agreements.  (*See* Doc. 88-12 at 2.)

## III.   Alleged "Campaign of Obstruction"

The following additional facts relate to the alleged "campaign of obstruction" between January 2013 and June 2015.[5]  The January 3, 2013 letter was addressed to Dr. Florian Büchting, who is the Corporate Information Officer of Weidmann Electrical Technology AG ("Weidmann Switzerland"), and who manages the IT requirements for the group of centrally managed

---

[4] This language regarding verification of compliance appears in the 2010 License Agreement.  Substantially similar language appears in the 2009 License Agreement.  (*See* Doc. 19-1 at 9.)

[5] Microsoft apparently contends that these facts are immaterial, and that the only material fact on this point is that Weidmann has not undertaken the software verification since the January 2013 request.  (*See* Doc. 92 at 5–6.)  The court concludes that it is necessary to discuss these facts in order to determine whether Microsoft has proven a breach.

companies owned by WICOR, including Weidmann.  (*See* Doc. 88-2 at 1, ¶ 1.)  EY emailed

Dr. Büchting on January 7, 2013, advising that "Weidmann Industries" had been selected for a

license compliance inspection.

The stated purpose of the email was to describe "the necessary steps to perform the

inspection" and to "confirm the inspection arrangements/logistics and roles and responsibilities."

(Doc. 88-4.)  The email stated that EY expected the fieldwork to begin after receipt of relevant

data from Weidmann Industries, that the field inspection would take 10–15 working days, and

that Microsoft had requested that the on-site audit commence by February 4, 2013.  (*See id.*)

Attached to the email was a seven-page document entitled "Microsoft—End User Inspection

Overview & Initial Data Requests."  (Doc. 88-4 at 4–10.)

Dr. Büchting responded by email on March 1, 2013, stating that Weidmann was too busy

to permit the audit at that time.  In that email, Dr. Büchting stated that Microsoft Switzerland

GmbH had recently completed an extensive review of Weidmann Switzerland, and that because

of a recent corporate reorganization and the fact that many key personnel were extremely busy

with high-priority projects, "we do not have time currently to repeat this audit-project."

(Doc. 88-5 at 2; *see also* Doc. 88-2 at 3, ¶ 8.)  According to Dr. Büchting's email, "[w]hat would

be ok for me is to sit together and review the last audit."  (Doc. 88-5 at 2.)[6]  Dr. Büchting did not

agree with the scope of the inspection that EY described, concluding that it was "unreasonably

burdensome and invasive" and that it "would interfere with normal business operations."

(Doc. 88-2 at 3, ¶ 8.)

_____

[6] Dr. Büchting's March 1, 2013 email describes the previous review of Weidmann
Switzerland as an "audit."  In its Amended Complaint, Microsoft asserts that "Microsoft
representatives had visited a Swiss Weidmann entity [in 2010], but neither they nor any third
party had begun, let alone completed, any license verification."  (Doc. 19 at 7, ¶ 28.)  Weidmann
denies that allegation.  (Doc. 48 at 3, ¶ 28.)  The parties have not presented any factual details
regarding the nature of the 2010 review.

By July 2013, there was still no agreement.  According to an email from Microsoft to Dr. Büchting, Microsoft received "assurance" in July 2013 that the audit would start in August 2013.  (Doc. 88-6 at 3.)  The audit did not start in August 2013.  It is unclear what occurred in the 15 months between August 2013 and November 2014, although it is undisputed that no verification was performed.

On November 17, 2014, Microsoft emailed Dr. Büchting stating that Microsoft would allow "some time" for Dr. Büchting's management to look into whether engagement of EY as auditors presented a conflict of interest.  (*See id.*)  Also in that November email, Microsoft noted that there had been discussion about running EY software in the course of the audit, and instructed Dr. Büchting to "[p]lease make arrangements to run this script asap or to advise EY on how you alternatively plan to deliver the relevant data in an equal degree of accuracy and completeness."  (*Id.*)  Finally, Microsoft asserted that it could not tolerate any further delays, and that it expected Dr. Büchting to supply, by November 20, 2014, three possible dates for EY's on-site process, to take place before December 12, 2014.  (*Id.*)

In an email reply dated November 28, 2014, Dr. Büchting did not supply possible dates for any onsite verification, but instead reiterated concerns about the perceived conflict of interest and the use of EY software:

> I have spoken to our CFO and next week, there is E&Y IKS team at WEIDMANN, we will check with them how to proceed.  The question is also why it is E&Y from D[e]nmark, this far away, much travel etc. and probably expensive.
>
> Running external software on the very sensitive WEIDMANN IT-server infrastructure is probably not accepted from business, especially in the medical division, we have high confidentiality obligations from our customers, also in the Automotive division . . . .
>
> What I did so far I showed to E&Y (Morten and team) our whole license management process and the reporting, both on license entitlement side as well as

6

on the user-deployment side and license balancing. We use the Microsoft license management tool Microsoft MAP Toolkit 9 for reporting in addition to our license inventory and the Microsoft Active Directory (AD) reports.

(Doc. 88-6 at 2.) The on-site process did not commence on December 12, 2014.

In a December 16, 2014 email from EY to Dr. Büchting, EY stated that Microsoft had directed EY to provide "a list of initial data delivery with a delivery deadline at 23 December 2014." (Doc. 88-8 at 4.) The email listed several categories of sources from which EY required data. In an email dated December 23, 2014, Dr. Büchting replied: "Sure we can deliver quite a number of below listed information," but that scanning would be "very difficult" because of confidentiality concerns and because the automotive division could not tolerate any unplanned downtimes. (*Id.* at 3.) Dr. Büchting stated that he would "go back to my team as fast as possible" and that "[i]n the first January week, one of the big projects should be closed (3 company mergers) and this should release IT a bit." (*Id.*)

In an email to Dr. Büchting on January 7, 2015, EY offered meetings to explain why its software would not raise confidentiality or operational problems. Specifically, EY stated:

> I recognize that you (or parts of your business) have concerns regarding our Inventory Tool as you have expressed these earlier in the process. This was also the background on which we offered to have a conf call and/or live demo of the tool to the relevant and concerned people before you release it in your test environment for final verification and change management. This offer still stands.
>
> There are many parameters buil[t] into our Inventory Tool that [are] specifically designed to not interfere with production and in-time delivery—we are fully aware that this is a concern for many companies worldwide. We would be able to walk through these on a conf call.
>
> Regarding confidentiality then we have forwarded our NDA (3 November 2014) and furthermore there is no confidential data extracted by our Inventory Tool[;] again this could be documented at a live demo. We will only see data at the same level as shown in add/remove programs.

As you have previously also mentioned a potential conflict as EY are also financial auditors I have attached a letter stating that from an EY perspective (globally) there is no such conflict or independence issues.

(*Id.*)  On January 9, 2015, Dr. Büchting replied as follows:

With the concern on external tools and scanning devices is still a topic. Both for confidentiality as well as for performance.  We are working in a very sensitive environment, e[s]pecially for Medical Business Unit as well as for Automotive Business Unit.  The Business does not want to have external tools on the systems and we are also very restrictive even for internal tools or changes to implement in production environment.  Our medical customers work on early very sensitive products, we are embedded in early worldwide development of new products, the other big medical/chemical customers are very keen on.  And Auto is very sensitive on both early development . . . as well as with performance and stability because of critical first-[tier] delivery right into assembly lines.

(*Id.* at 2.)

In a letter dated February 21, 2015 and addressed to Microsoft's attorney Clara Shin, Dr. Büchting stated that he had received a February 3, 2015 letter that Attorney Shin had sent. (Doc. 88-9 at 2.)  Dr. Büchting insisted that "Weidmann fully complies with its contractual obligations" and that "[t]here are no improperly licensed Microsoft products in our portfolio and there is no shortfall of licenses at all." (*Id.*)  Dr. Büchting also denied that Weidmann had obstructed the verification or that Weidmann was in breach of its verification obligations.  (*Id.*) He stated that Microsoft had not answered Weidmann's invitations to visit the company in Rapperswil; that Weidmann had shown "all relevant license management topics to the E&Y team from Denmark"; that Microsoft had previously conducted an "extensive license audit on-site in Rapperswil in 2010"; and that "a confidentiality agreement between E&Y and WEIDMANN would not be sufficient to ensure compliance with Swiss laws." (*Id.* at 2–3.)[7]

Microsoft filed its original complaint in this case on June 30, 2015.  (Doc. 1 at 10.)

---

[7] In its Amended Complaint, Microsoft asserts that it responded on April 14, 2015 "with an explanation of why Weidmann's new arguments lacked any factual or legal justifications." (Doc. 19 at 1, ¶ 43.)  Weidmann denies that allegation.  (Doc. 48 at 5, ¶ 43.)

### Procedural History

Litigation in this case commenced with a dispute over whether Microsoft has standing to bring its claims.  (*See* Doc. 20, Weidmann's Mot. to Dismiss.)  In a Scheduling Order dated December 21, 2015, the court ordered the parties to confer "as expeditiously as possible concerning the verification process" and to report back to the court concerning their success in reaching agreement on the process.  (Doc. 27 ¶ 3.)  The court advised that, if the parties were unable to reach agreement on the verification process by March 1, 2016, it would hold a hearing. (*Id.* ¶ 4.)

On March 1, 2016, the parties jointly reported that they had been unable to reach agreement on a verification process.  (Doc. 43.)  Microsoft reported that it had sent to Weidmann on January 22, 2016 a proposed verification protocol that had been prepared by EY (the "EY Protocol").  (Doc. 43 at 2.)  According to Microsoft, the EY Protocol was designed to "accommodate Weidmann's stated concerns regarding privacy and data security," and therefore included a provision that the verification "be conducted at Weidmann's parent-company's headquarters in Switzerland."  (Doc. 43 at 2; *see also* Doc. 43-1 at 3.)  The EY Protocol also included a non-disclosure/confidentiality agreement.  (Doc. 43-1 at 9–10.)  Microsoft further reported that Weidmann had responded that the EY Protocol was not acceptable.  (Doc. 43 at 3.) Weidmann reported that it would present a different position as to how the verification process should proceed, and that Swiss law "needs to be considered, followed and applied in connection with the verification process."  (Doc. 43 at 5.)

In a decision dated March 15, 2016, the court denied Weidmann's motion to dismiss. (Doc. 45.)  In that decision, the court also noted that the parties had failed to agree upon an audit process, and indicated that it would set a full-day hearing to discuss an appropriate process.  (*Id.*

at 1, 3.)  The court further indicated that one topic for discussion at the hearing would be whether an audit in Switzerland would violate Swiss law.  (*Id.* at 3.)

In a pre-hearing memorandum filed on April 21, 2016, Weidmann attached the 17-page report of its expert, Swiss attorney Mark Livschitz, dated April 20, 2016.  (Doc. 54-1.)  Attorney Livschitz opined that, unless explicitly permitted by the Swiss government or a Swiss court in a Hague Mutual Legal Assistance Treaty, Microsoft's enforcement of its audit rights pursuant to a United States court order would violate the "blocking statutes" in Swiss criminal law.  (*See* Doc. 54-1 at 1.)  In its April 21, 2016 memorandum, Weidmann represented that it had presented to Microsoft a proposal that would avoid exposure to criminal liability under Swiss law. Weidmann's proposal was as follows:

> -- the audit will NOT be considered Court directed/Ordered.  The audit will be deemed a commercial audit as opposed to Court directed/Ordered-- this is a concept discussed on the last conference call with the Court;
>
> -- EY can use their procedures during a commercial audit.  The audit should be conducted using Microsoft tools and any tools, if necessary, already installed by Weidmann Switzerland.  It should be noted that EY has indicated to Weidmann Switzerland that the audit can be conducted without using any EY tools. Notwithstanding the statement that EY made about not needing to use its tools in an audit, if for some reason Microsoft now insists on using EY tools in the audit Weidmann Switzerland will allow the EY tool to be used based upon your April 11 representation that the EY script "functions by querying systems for installed software through Windows Management Instrumentation (WMI)";
>
> -- due to the restrictions and requirements of Swiss law that are set forth in detail in the Report of Mark Livschitz, Weidmann Switzerland needs the suggestions of Mr. Livschitz be complied with to avoid anyone violating Swiss law.  Among other things, the results of the audit will have to stay in Switzerland.  Of course however, Microsoft's attorneys will be able to be orally told the results of the audit;
>
> -- following the audit and before May 10, a Weidmann representative will meet with a Microsoft representative in Switzerland (without attorneys) and try in good faith to amicably resolve this matter; and

> -- in the event that the parties' efforts after the audit to attempt to amicably
> resolve this situation are not successful, then Microsoft's attorneys and
> Weidmann's attorneys will present their arguments to the Court on May 10 as to
> whether the audit and the results of the audit will be able to be used for
> evidentiary purposes in the lawsuit.

(Doc. 54 at 11–12.)  The parties differ as to whether Microsoft "rejected" Weidmann's proposal or instead offered a "compromise," but it is undisputed that the parties did not come to an agreement as to any "voluntary" audit.

At a hearing on May 10, 2016, the court heard testimony from the parties' respective Swiss law experts regarding Article 271 of the Swiss Criminal Code.  (*See* Doc. 62, Hr'g Tr.)  The court is also in receipt of written opinions from those experts.  (*See* Docs. 54-1; 70-3; 71-3.)  After receiving post-hearing filings from the parties (Docs. 70, 71), the court issued an Entry Order requesting briefing on the appropriate procedural route for issuing a ruling.  (Doc. 72.)  In an Entry Order dated August 11, 2016, the court determined that the issue of specific performance of the verification process should be analyzed under the summary judgment procedure, and invited motions for partial summary judgment.  (Doc. 78 at 4.)

## Analysis

## I.   Microsoft's Motion to Strike

Microsoft asserts that Weidmann's Motion for Partial Summary Judgment (Doc. 83) should be stricken because it does not actually seek summary judgment, and is merely a premature opposition to Microsoft's Motion for Partial Summary Judgment.  (*See* Doc. 95 at 5.)  Weidmann maintains that it has "properly moved for partial summary judgment as to the claim for specific performance asserted by Microsoft."  (Doc. 91 at 10.)  According to Weidmann, it "properly seeks an order declaring that Microsoft is not entitled to specific performance and that if the Court disagrees, the Court-ordered audit may proceed only in a way that does not offend

Article 271." (*Id.*)  Because the court invited both parties to file summary judgment motions on the issue of specific performance, it will consider all of the parties' filings on that issue. Microsoft's Motion to Strike (Doc. 95) will be denied.

That said, Weidmann's Motion for Partial Summary Judgment purports to supply evidence that Weidmann "has complied with applicable software licensing requirements and that Microsoft's claims of widespread license abuse are unfounded." (Doc. 83 at 2.)  That is not the issue on which the court invited summary judgment motions.  Moreover, the issue of whether Weidmann has in fact complied with applicable software licensing requirements is plainly in dispute—if it were not, Microsoft would not be pursuing an order requiring specific performance of Weidmann's verification obligation.  The court's focus here is whether to enter an order requiring the verification process to proceed at Weidmann's parent company's headquarters in Switzerland, and whether such an order would violate Article 271 of the Swiss Criminal Code.

## II.     The Cross-Motions for Partial Summary Judgment

### A.     Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When addressing cross-motions for summary judgment, the court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Board of Educ. of City Sch. Dist. of City of Olean,* 667 F.2d 305 (2d Cir. 1981).

### B.     Breach of Contract

Under Washington law, "[i]n order to succeed on a breach of contract claim, a Plaintiff must prove four elements: duty, breach, causation, and damages." *Hard 2 Find Accessories, Inc.*

*v. Amazon.com, Inc.*, 58 F. Supp. 3d 1166, 1171 (W.D. Wash. 2014), *appeal docketed* No. 14-36059 (9th Cir. 2014); *see also St. John Med. Ctr. v. State ex rel. Dep't of Soc. & Health Servs.*, 38 P.3d 383, 390 (Wash. Ct. App. 2002) (to prevail on breach-of-contract claim, plaintiff must show "(1) the existence of a contract, (2) a material breach of that contract, and (3) resulting damage").[8]  Here, there is no dispute as to contract formation; the License Agreements create a duty on Weidmann's part to submit to a verification process.

Weidmann asserts that there is a dispute "as to the intended scope and methodology of the verification," and that as a result, there is a dispute as to whether Weidmann is in breach of its verification obligation.  (Doc. 88 at 3.)  According to Weidmann, summary judgment is inappropriate because of Microsoft's alleged "insistence on unilaterally dictating the scope and methodology of the verification through the use of the EY protocol." (*Id.* at 2.)  Microsoft maintains that Weidmann breached its contractual verification obligation because "[t]here is no dispute that Weidmann has not undertaken the independent verification initiated by Microsoft on January 3, 2013."  (Doc. 82-1 at 9; *see also* Doc. 92 at 5–6.)

Even giving Weidmann the benefit of all reasonable doubts and inferences, the court concludes that Weidmann breached the License Agreements by obstructing the audit process required by those agreements.  It is true that the License Agreements do not specify a particular protocol for the verification process.[9]  But the parties' inability to agree on a protocol for *two and a half years* after Microsoft's January 2013 notice strongly suggests obstructionism.

---

[8] As noted above, the License Agreements select Washington law as the applicable law.

[9] The License Agreements do include some general requirements about the verification process.  For example, the independent auditor's verification process must be subject to a confidentiality obligation; 30 days' notice must be given prior to the verification; and the process must not interfere unreasonably with the customer's operations.

The facts in the record regarding the events over that period of time show precisely that. In March 2013, Weidmann's excuse was that it was too busy for an audit. No audit commenced after a July 2013 "assurance" that the audit could start in August 2013. Even after Microsoft's November 17, 2014 email setting deadlines and insisting that further delay would not be tolerated, Weidmann persisted in its arguments about a perceived conflict of interest and the use of EY software. Despite assurances from EY and an offer to demonstrate EY's software at a meeting, Weidmann maintained in January 2015 that "external" tools were still a "concern." In response to Attorney Shin's February 3, 2015 letter, Weidmann continued to insist that it was fully licensed, and that it had shown that it was licensed to the EY Denmark team and at the 2010 review in Switzerland. Weidmann also asserted that Swiss law rendered any confidentiality agreement between EY and Weidmann insufficient.

All of the obstacles Weidmann erected against the verification for the two and a half years before Microsoft brought this suit have since fallen away. Regarding the alleged conflict of interest with EY, counsel for Microsoft represented at a December 21, 2015 hearing that the issue had been resolved. (*See* Doc. 46 at 55.) By April 21, 2016, Weidmann's own proposal included EY as the auditor. (*See* Doc. 54 at 11 ("EY can use their procedures during a commercial audit.").) Weidmann's concern about the insufficiency of a confidentiality agreement also does not appear in Weidmann's April 2016 proposal.[10] Weidmann's April 21, 2016 proposal also stated that Weidmann would allow the EY software to be used based on its

---

[10] If the concern was that a confidentiality agreement would not cure the perceived problem with Article 271, the court discusses Article 271 in detail below.

14

understanding that the EY script "functions by querying systems for installed software through Windows Management Instrumentation (WMI)." (Doc. 54 at 12.)[11]

Weidmann cites several cases for the proposition that a dispute over the scope and methodology of a contractually required audit is sufficient to defeat summary judgment. (Doc. 88 at 18–20.) All of those cases are distinguishable. In *Revson v. Claire's Stores, Inc.*, the plaintiff, Rommy Revson, held design patents on hair accessories known as "scrunchies," and brought a contract action against two boutiques that had allegedly breached a written license agreement. 120 F. Supp. 2d 322, 323 (S.D.N.Y. 2000). One basis for the alleged breach of contract was that the boutiques had allegedly refused to give Revson's accountant access to their books and records, despite an audit provision in the license agreement. *See id.* at 326. Revson sought pre-discovery partial summary judgment on that claim.

The court denied that request, noting that the boutiques had asserted that Revson's request "sought access to far more than [Revson] was entitled to see," and reasoning that Revson could not prove the absence of a genuine issue of material fact just because the boutiques admitted denying her request for an audit. *Id.* *Revson* is distinguishable because the court in that case lacked any facts concerning the rationale for the boutiques' denial of Revson's requests for an audit. Here, by contrast, ample facts demonstrate repeated denials of the audit request for a two and a half year period, for a variety of reasons that have all since been abandoned or turned out to be non-issues.

*Discovision Assoc's., v. Toshiba Corp.* is distinguishable for the same reason. The plaintiff-licensor in that case, Discovision (DVA), sued licensee-Toshiba alleging breach of the

---

[11] In its Opposition, Weidmann asserts that it has "never agreed unconditionally to allow EY to use the non-Microsoft tool it insists on using." (Doc. 88 at 10.) However, all of the examples Weidmann supplies of its objections to the EY software are from before April 21, 2016.

parties' license agreement, including DVA's rights to an audit and for an accounting of royalties. No. 08cv3693(HB)(AJP), 2008 WL 4500693, at *1 (S.D.N.Y. Oct. 7, 2008).  The license agreement entitled DVA to review "such records and other documents as may be necessary." *Id.* at *4.  DVA informed Toshiba on August 15, 2006 that it was electing to exercise its royalty inspection rights, and the auditor began seeking documents and information in early September 2006.  Toshiba "disagreed with the scope of the royalty inspection, asserting that some of the requested information was overly broad, intrusive, and irrelevant to calculating royalties paid and due." *Id.* at *2.

DVA filed its complaint on April 17, 2008 and, before any discovery or initial disclosures, DVA moved for partial summary judgment on its claim to enforce its right to an audit.  The court denied DVA's motion, reasoning that the only guidance it had before it regarding the permissible scope of the audit was the language of the license agreement, which by itself did not make it clear whether the auditor was entitled to review the records it had requested.  *See id.* at *4.  As in *Revson*, without additional facts, the *Discovision* court could not evaluate whether the audit provision had been breached.  This case is in a different procedural posture, and the facts demonstrate that Weidmann's repeated denials of Microsoft's audit request over the course of two and a half years were obstructionist.

*Nano-Proprietary, Inc. v. Keesmann*, No. 06 C 2689, 2007 WL 433100 (N.D. Ill. Jan. 30, 2007), is similarly distinguishable.  That case also involved a licensee's refusal to permit an audit under a licensing agreement because of disagreements about the audit's scope.  The licensor in that case, Keesmann, requested an audit in December 2005, and letters authorizing the audit were finalized in mid-February 2006.  *Id.* at *5.  Between that time and March 22, 2006 (when Keesmann terminated the agreement), the licensee, Nano-Property, Inc. (NPI), disagreed about

16

the scope of the audit, and requested that the licensor sign a confidentiality agreement. *Id.* Granting NPI's motion for a preliminary injunction enjoining the termination, the court concluded that "in light of the unique property that NPI was trying to protect, NPI's request for a confidentiality agreement and attempt to contain the extent of the audit is not necessarily unreasonable." *Id.* Unlike *Nano-Properties*, this case involves a dispute lasting not two and a half months, but two and a half *years*; and for the reasons discussed above, Weidmann's shifting objections to the audit were unreasonable.

In *MedImmune, LLC v. PDL BioPharma, Inc.*, PDL counterclaimed for breach of contract, alleging that MedImmune had refused to permit PDL's auditor to conduct an independent inspection of MedImmune's "books and records" under the parties' license agreement. No. C 08-5590 JF (HRL), 2011 WL 61191, at *20 & n.15 (N.D. Cal. Jan. 7, 2011). MedImmune's position was that authorizing an independent accounting firm to examine "books and records" did not authorize the auditor to also conduct interviews with MedImmune employees. *See id.* at *15, *20. PDL maintained that standard industry practice under such terms included authorization to interview employees. *See id.* at *20. Both parties presented experts to support their positions regarding industry practice. The court denied MedImmune's summary judgment motion on that counterclaim, reasoning that the license agreement was "ambiguous as to the scope of PDL's inspection rights and there is a conflict in the evidence as to the industry standard." *Id.* In contrast to *MedImmune*, this case does not involve any dispute over standard industry interpretation and practice regarding any of the verification provisions in the License Agreements.

Finally, in *Eagle View Technologies, Inc. v. Xactware Solutions, Inc.*, the parties had entered into an agreement in November 2008 under which Xactware had a right "upon

reasonable notice and at its expense, to perform an audit of the relevant documentation to confirm the Percentage Payment." Case No. C12-1913-RSM, 2013 WL 12071668, at *1 (W.D. Wash. June 26, 2013). On October 29, 2012, Eagle View filed a complaint, asking the court to enjoin Xactware from terminating the agreement, and on December 19, 2012, the court granted in part Eagle View's preliminary injunction motion, enjoining the parties from terminating or modifying the agreement. *Id.* While the court's injunction was in effect, Xactware twice requested to conduct an audit of Eagle View's records, and Eagle View denied the requests as "overbroad and beyond the scope of the audit rights provided in the Agreement." *Id.* Xactware filed a motion seeking to hold Eagle View in contempt of the court's December 19, 2012 order. *Id.*

The court denied Xactware's motion, concluding that Xactware had not shown a clear violation of the preliminary injunction. The court reasoned that Eagle View had "not denied the audit altogether, but has rather agreed to a more narrowly tailored audit at its counsel's office." *Id.* at *3. The court also found that Xactware had made "no argument on Eagle View's willingness to comply with a tailored audit as a failure to take all reasonable steps to compliance with the Court's Order." *Id.* Unlike this case, *Eagle View* involved application of the standard for civil contempt. More importantly, like the other cases cited above, *Eagle View* shows that the facts and the rationale for denial of an audit matter. The court in *Eagle View* had no basis upon which to conclude that Eagle View's offer to comply with a narrower audit was a failure to comply with the court's order. In contrast, Weidmann's series of objections to Microsoft's audit (none of which continue to hold any force), and Weidmann's success in forestalling the audit for more than two and a half years, show that the situation here was not a legitimate dispute over the scope of the audit.

18

For all of the above reasons, the court concludes that Weidmann has breached the License Agreements by obstructing Microsoft's attempts to perform the verification required by those agreements. *See Liberty Mut. Ins. Co. v. Decking & Steel, Inc.*, 301 F. Supp. 2d 830, 834 (N.D. Ill. 2004) (finding breach of contract on summary judgment where defendant had obstructed the plaintiff's attempts to perform audits required by contract). That breach has also caused Microsoft harm, in that Microsoft has been deprived of its contractual right to an independent audit to determine whether Weidmann is sufficiently licensed for the Microsoft products that it is using.

### C.   Specific Performance is the Appropriate Remedy

Microsoft asserts that specific performance is the proper remedy for Weidmann's breach. (Doc. 82-1 at 10–11.) Weidmann maintains that, under Washington law, specific performance is only rarely awarded outside the context of real property, and that this case is unlike any Washington specific-performance case outside of that context. (Doc. 88 at 20–21.) Microsoft replies that specific performance is not limited to real property cases, and that specific performance is appropriate because there is no adequate remedy at law. (Doc. 92 at 12.)

Under Washington law, "[w]hen a court's legal powers cannot adequately compensate a party's loss with money damages, then a court may use its broad equitable powers to compel a party to specifically perform its promise." *Pardee v. Jolly*, 182 P.3d 967, 973 (Wash. 2008) (en banc) (quoting *Crafts v. Pitts*, 162 P.3d 382, 386 (Wash. 2007) (en banc)). "Specific performance is frequently the only adequate remedy for a breach of a contract regarding real property because land is unique and difficult to value." *Id.*; *see also Brotherson v. Prof'l Basketball Club, L.L.C.*, 604 F. Supp. 2d 1276, 1293 (W.D. Wash. 2009) ("Most Washington authority discussing specific performance focuses on real property. Only rarely is specific performance available in other contexts."). That observation may explain the particular

usefulness of specific-performance in the real property context as understood by Washington courts, but it does not necessarily imply that the requirements for granting specific performance are different outside the context of real property.

Here, specific performance is available because there is no adequate remedy at law for Weidmann's breach of its verification obligation.  The court is not ruling here on Microsoft's separate claim that Weidmann breached the License Agreements by failing to order licenses for all copies of Microsoft software that it has run during the term of the License Agreements. (*See* Doc. 19 at 17.)  Money damages would be an adequate remedy for a breach in that respect. But without the verification to which Microsoft is contractually entitled, Microsoft is unable to determine if Weidmann is in fact under-licensed, and thus unable to properly seek any damage award to which it might be entitled.  *See Trustees of the Local 7 Tile Indus. Welfare Fund v. EAQ Constr. Corp.*, No. 14 CV 4097 (SJ) (CLP), 2016 WL 4540306, at *17 (E.D.N.Y. Aug. 12, 2016) ("[W]ithout the ability to audit Taj, plaintiffs would be unable to calculate precisely how much work was performed . . . , leaving them unable to properly seek a well-grounded damages award from this court, precluding them from being remedied by money damages." (internal quotation marks omitted)), *report and recommendation adopted*, 2016 WL 4536866 (E.D.N.Y. Aug. 30, 2016).[12]

*Brotherson* does not compel a contrary result.  In that case, three 2007 basketball season ticket holders for the Seattle Supersonics accepted an offer from the team's owner, PBC, to join

---

[12] *See also Local Union No. 40 of the Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers v. Car-Win Constr. Inc.*, 88 F. Supp. 3d 250, 278 (S.D.N.Y. 2015) ("[I]n order to enable plaintiffs to determine the amount of unpaid contributions owed to them, CRV should be ordered to submit to an audit of its financial records . . . ."); *La Barbera v. Fed. Metal & Glass Corp.*, 666 F. Supp. 2d 341, 350 (E.D.N.Y. 2009) (where defendant had refused to submit to an audit, and had demonstrated an intent to frustrate any judgment, plaintiffs were entitled to an order requiring defendant to submit to an audit).

20

an exclusive club with special benefits (including an option to purchase 2009 and 2010 season tickets at 2007 prices). In summer 2008, after the plaintiffs had entered into that arrangement, the team left Seattle for Oklahoma, and became the Oklahoma City Thunder. Alleging breach of contract, the plaintiffs sought specific performance of their option to purchase 2010 season tickets at 2007 prices. They did not intend to attend a Thunder game in Oklahoma, but anticipated reselling the tickets for a profit through the Thunder's Ticket Exchange. PBC moved for summary judgment disposing of the specific-performance request. *See Brotherson*, 604 F. Supp. 2d at 1292–93.

The court granted PBC's motion, reasoning that the plaintiffs had failed to show any lack of adequate legal remedy. Indeed, by describing their intent to resell the 2010 tickets for a profit, the plaintiffs had admitted "that money would satisfy them." *Id.* at 1293. This case is entirely different. *Brotherson* did not involve any claim of breach of a contractual right to audit or verification, nor was there any need to such a procedure in that case. There is no market for Microsoft's verification rights, and those rights cannot be vindicated with an award of damages. The fact that Microsoft might ultimately use the results of the verification to seek money damages does not make the verification right itself compensable with money damages.

Weidmann also asserts that ordering specific performance would be inappropriate because it would, in Weidmann's view, "be tantamount to an order requiring employees of Weidmann affiliates to violate the Swiss Criminal Code, thereby exposing them to criminal prosecution." (Doc. 88 at 22.) As the court previously observed, specific performance is an equitable remedy, and it would not be equitable to require specific performance of an audit that

is illegal under Swiss law.  (Doc. 78 at 3.)  Whether the audit would be illegal under Swiss law is

the final obstacle to an order of specific performance, and the court turns to that issue next.[13]

**D.   Article 271 (the Swiss "Blocking Statute")**

Before discussing Article 271 and the parties' positions as to its applicability, the court

pauses briefly to explore whether the issue can be avoided.  Weidmann asserts that all issues

about Article 271 can be avoided either by conducting a "voluntary audit," pretrial discovery, or

by proceeding under the Hague Convention on the Taking of Evidence Abroad in Civil or

Commercial Matters.  (Doc. 83 at 4; 22–23.)  Microsoft insists that none of those options would

remedy Weidmann's non-compliance with its verification obligation.  (*See* Doc. 89 at 19.)

As to a "voluntary audit," that ship has already sailed.  As the court previously noted, the

parties invested three months of effort to negotiate a mutually acceptable process without

reaching an agreement.  (*See* Doc. 45 at 1.)  The five-point "voluntary audit" that Weidmann

proposed in its April 21, 2016 memorandum would be useless because, under that proposal, the

report could not leave Switzerland and could not be used in this court.  The court discussed these

points at the May 10, 2016 hearing.  (Doc. 62 at 7.)

Pretrial discovery is no more useful, since Microsoft's right to a verification process is

not a discovery right, but a contractual right.  The independent verification contemplated in the

---

[13] The court rejects Weidmann's argument that a grant of specific performance on summary judgment would be "equivalent" to the entry of a mandatory preliminary injunction without the benefit of discovery.  (*See* Doc. 88 at 23.)  The requirements for granting a preliminary injunction are indeed "more stringent" than the requirements for ordering specific performance.  *Firemen's Ins. Co. of Newark, N.J. v. Keating*, 753 F. Supp. 1146, 1152 (S.D.N.Y. 1990) (quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 227 (3d Cir. 1987)).  But on the verification issue, this case is past the preliminary injunction stage.  The court specifically asked the parties what procedural posture it should use to evaluate that issue (*see* Doc. 72), and Weidmann's response was that "framing the relief one way or another will not avoid the illegality of the audit under Swiss law."  (Doc. 74 at 1.)  The court elected to resolve the specific-performance issues under Rule 56.  (Doc. 78 at 2.)  No additional discovery was necessary on the legal question of the impact of Swiss law.

License Agreements is different than the production of evidence in a discovery process. Rather than relying on production by a party, the verification involves the work of an independent auditor. The documentation that Weidmann has submitted in support of its Motion for Partial Summary Judgment demonstrates the reason the parties originally agreed to the audit process: Weidmann now contends that it has produced responsive evidence showing that it is fully licensed; Microsoft maintains that Weidmann's assertions are unreliable.

For similar reasons, the Hague process is also not useful in this case. As this court noted in a prior case, the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Cases was adopted "to provide a uniform system of discovery in foreign jurisdictions." *Murphy v. Reifenhauser KG Maschinenfabrik*, 101 F.R.D. 360, 361 (D. Vt. 1984). Again, the right that Microsoft is seeking to enforce is a contractual right, not a right to discovery.

The court now returns to the issue of Article 271.[14] Translated to English, Article 271 of the Swiss Criminal Code (SCC) prohibits, in pertinent part, activities carried out by persons "on behalf of a foreign state on Swiss territory without lawful authority, where such activities are the responsibility of a public authority or public official." Schweizerisches Strafgesetzbuch [StGB] [Criminal Code] Dec. 21, 1937, art. 271, para. 1 (Switz.), *available at* https://www.admin.ch/opc/en/classified-compilation/19370083/index.html#a271.[15] The parties

_____

[14] Swiss law is outside the expertise of the court, but the court's task is not to definitively determine what Swiss law is, but rather to decide whether the risk of prosecution under Article 271 is so great that ordering specific performance would be inequitable. Insofar as the court may be required to "determine" Swiss law, it "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1.

[15] The English translation appears on the website of the Swiss Federal Council. Although the website states that the translation is "for information purposes only" and has "no legal force," the parties both rely on this English translation of Article 271. (*See* Doc. 70 at 3; Doc. 82-1 at 14.)

and their experts have reached opposite conclusions as to whether Article 271 would apply if this court were to order specific performance of the verification process.

At the May 10, 2016 hearing, Microsoft's expert, Swiss attorney Philipp Fischer, opined that implementation of the EY Protocol[16] (even if court-ordered) would not breach Article 271, because there would be no "public authority act" within the meaning of Article 271. (Doc. 62 at 97.) According to Attorney Fischer, Article 271 only applies when there is a "public authority act being conducted in Switzerland." (*Id.* at 100.) Attorney Fischer's view is that, when a Swiss party is complying with contractual obligations undertaken with another party, all of the involved actors are private (not public) parties. (*See id.*; *see also* Doc. 71-3 at 7 ("[E]nforcement of a contractual verification procedure between private parties does not amount to a public authority act within the meaning of Article 271(1) SCC.").) Also according to Attorney Fischer, there is no "public authority act" even if the verification is court-ordered: "[T]he mere fact that there is this injunction of the Court to comply with a contractual agreed upon mechanism does not transform this verification into a public authority act." (Doc. 62 at 153.)

In contrast, Weidmann's expert, Swiss attorney Mark Livschitz, testified that, based on his review of Swiss precedents, "irrespective of the contractual or non-contractual nature, just based on the nature of proceeding on the part of Ernst & Young it is extremely dangerous to do [the verification] in Switzerland without either involving Swiss authorities or going through the Hague process." (Doc. 62 at 172; *see also id.* at 176.) According to Attorney Livschitz, the relevant Swiss authorities "clearly do not take into account this distinction [contractual versus non-contractual] and despite this distinction just rely on the nature of the acts performed and their link to foreign authorities or a foreign court proceeding." (Doc. 62 at 181.) Attorney

---

[16] Recall that the EY Protocol appears in the record at Document 43-1. It was also admitted at the May 10, 2016 hearing as Plaintiffs' Exhibit 4A. (*See* Doc. 60.)

Livschitz opined that the court could issue an order directing Weidmann to perform its contractual agreement, but that the Article 271 problem would arise when "somebody comes to Swiss soil and forces this order in a manner comparable to a prosecutorial investigation." (*Id.* at 211.)

The principal Swiss authority upon which Attorney Livschitz relies for his conclusions is: Bundesgericht [BGer] [Federal Supreme Court] Sept. 30, 1988, 114 Entscheidungen des Schweizerischen Bundesgerichts [BGE] IV 128 (Switz.).[17]  In that case, a Swiss attorney, "H," was working to defend his client, "B," who was the subject of a criminal investigation in Australia for alleged financial crimes.  The evidence against B included documents that had been provided by a Swiss bank.  Seeking to "undermine the evidentiary force" of those documents, but without approval from any Swiss authority, H went to the bank and questioned bank representatives, and then introduced their statements in the Australian proceedings.  H was found guilty of violating Article 271, and appealed.  (*See* Doc. 57-8 at 3–4.)

Denying H's appeal, the Federal Supreme Court explained that a person violates Article 271 if, when on Swiss territory and without authorization, "he undertakes acts for a foreign state that are reserved to an authority or an official, or if he abets such acts."  (*Id.* at 4.) An act "reserved to an authority or official" within the meaning of Article 271 is "any act that, regarded in and of itself, i.e., based on its essence and purpose, is characterized as official activity."  (*Id.*)  According to the Federal Supreme Court, H's act of questioning the bank personnel had an "official character" because "the taking of evidence, for example by verbal questioning of eye- or ear-witnesses, is reserved under Swiss law . . . to the judge, an investigational authority or a prosecutorial authority."  (*Id.*)

---

[17] An English translation of this decision appears in the record at Doc. 57-8.

As Attorney Fischer explains, the 1988 case is distinguishable.  (*See* Doc. 71-3 at 4–5.)
Insofar as it requires the submission of documents or data, the EY Protocol is unlike a
prosecutor's interrogation of a witness.  (*See* Doc. 57-8 at 5 ("The submission of documents, as
opposed to the questioning of witnesses, is a transaction between parties that does not require an
official act . . . .").)  The EY Protocol does call for an "onsite validation" that includes
"interviews," (Doc. 43-1 at 6), but the "essence and purpose" of such interviews is nothing like a
prosecutor's questioning of a witness.  The purpose of the interviews is to help EY complete an
audit of Weidmann's licensing position in accordance with a contractual verification provision
between private parties.  Attorney Livschitz cited no precedent suggesting that enforcement of
such a verification is a duty of any Swiss public authority.

Other authority reinforces the conclusion that, even if ordered as a remedy by this court,
specific performance of the EY Protocol is unlikely to violate Article 271.  Regarding
Article 271, the Swiss Federal Department of Justice and Police has stated: "actions that are
allowed to be carried out by private individuals as part of an intrastate lawsuit cannot fall under
the element of offense if the actions are carried out with regard to a foreign court case." *Request
for Authorization Concerning the Handover of Documents in an English Civil Case*, VPB 2016.3
at 32–37 (Jan. 27, 2016).[18]  Notably, at least one other court in the Second Circuit has reached
similar conclusions regarding Article 271.  *See Motorola Credit Corp. v. Uzan*, 73 F. Supp. 3d
397, 404 n.3 (S.D.N.Y. 2014) (Article 271 "does not create criminal liability for a bank that
adheres to a U.S court's order to search for bank account documents located in Swiss bank
branches").  Moreover, Weidmann's interpretation of Article 271 would also make no sense: if

---

[18] An English translation of this decision appears in the record at Document 57-2.

non-Swiss courts could not enforce contractual provisions for audits in Switzerland, substantial business with Swiss-affiliated companies might come to a halt.

The court's conclusion about Article 271 reinforces its earlier determination that Weidmann is in breach of contract for obstructing the verification. Article 271 appears to be the most recent meritless rationale in a long string of excuses for avoiding verification dating back to March 2013.

### E.       Who Must Specifically Perform

As noted above, the EY Protocol calls for the "on-site" stage of the verification to be conducted at Weidmann's parent company in Rapperswil, Switzerland. (*See* Doc. 43-1 at 3.) Weidmann asserts that, under both Swiss and U.S. law, Weidmann Electrical Technology AG ("Weidmann Switzerland") is not bound by the License Agreements, and that equity precludes a grant of specific performance where such performance would require conduct by a third party over whom the promisor has no right to control. (Doc. 83 at 19.) Microsoft contends that Weidmann Switzerland is bound, both because it is a Weidmann "affiliate" as defined in the License Agreements, and because Weidmann's affiliates ratified the License Agreements. (*See* Doc. 89 at 14–18.) Microsoft also argues that the issue of whether Weidmann's Swiss affiliates are bound is immaterial, since the only reason that those affiliates are at issue in the case is because Weidmann insisted that the verification happen in Switzerland. (*Id.* at 13.)

Consistent with its statement at the May 10, 2016 hearing (*see* Doc. 62 at 7), the court will not require non-party corporations to act. But the court can order *Weidmann* to specifically perform its verification obligation. If, as it appears, Weidmann prefers to comply by making use of its parent companies' facilities in Switzerland, that is up to Weidmann. The EY Protocol already reflects that decision.

The EY Protocol also calls for verifications of all of Weidmann's affiliates. (*See* Doc. 43-1 at 2 (calling for a "software compliance verification of Weidmann Electrical Technology, Inc. *and its Affiliates'* . . . licensing and use of Microsoft software products." (emphasis added).)  At present, none of those affiliates are parties in this case.  The court therefore refrains from entering an order directed to a non-party.  This limitation does not excuse Weidmann from cooperating fully with an audit which reaches the full extent of use and copying of Microsoft products.  Subject to the License Agreements, these agreements expressly identify Weidmann's "Affiliates" as customers subject to payment of royalties and verification. Weidmann bears responsibility for verifying the use of Microsoft products by any of its affiliates since it contracted to do so when it entered into the License Agreements.

The court's action here is limited to ordering compliance with a contract.  The court has previously stated that it does not intend to hold any company or individual in Switzerland in contempt for non-compliance.  The likely enforcement mechanism in the event of a failure to comply would be an adverse inference against Weidmann Electrical Technology Inc. only.

28

## Conclusion

Microsoft's Motion to Strike (Doc. 95) is DENIED.

Microsoft's Motion for Partial Summary Judgment on Verification (Doc. 82) is GRANTED.

Weidmann's Motion for Partial Summary Judgment (Doc. 83) is DENIED.

Weidmann Electrical Technology Inc. is ORDERED to submit to a verification under EY's Verification Protocol dated January 22, 2016 (Doc. 43-1), with the initial "kick-off" meeting to occur within 30 days of this order, and the project timeline adjusted accordingly.

Dated at Rutland, in the District of Vermont, this 7th day of December, 2016.

Geoffrey W. Crawford, Judge
United States District Court